JILL M. CARASSO *v.* STEPHEN S. CARASSO
(AC 22965)

Schaller, DiPentima and Mihalakos, Js.

Argued September 12—officially released November 25, 2003

*Campbell D. Barrett*, with whom were *Jonathan P. Budlong* and, on the brief, *C. Michael Budlong*, for the appellant-appellee (defendant).

*Mark H. Swerdloff*, with whom, on the brief, was *Ileen P. Swerdloff*, for the appellee-appellant (plaintiff).

*Opinion*

SCHALLER, J. The defendant, Stephen S. Carasso, appeals and the plaintiff, Jill M. Carasso, cross appeals from the judgment of the trial court granting the plaintiff's motion for contempt, and granting in part the defendant's motion to modify alimony and certain orders concerning health and life insurance. On appeal, the defendant claims that the court improperly (1) determined his earning capacity and (2) adjudged him in contempt. On cross appeal, the plaintiff claims that the court improperly determined that (1) her earning capacity had changed and (2) a change in circumstances existed. We affirm the judgment of the trial court.

The court found the following facts. The parties' marriage was dissolved in December, 1998. The order of

the court required the defendant to pay to the plaintiff $700 a week in alimony. The defendant also was required to maintain health insurance for the plaintiff "comparable to the coverage that [the defendant] maintains for himself . . . ." In addition, the defendant was required to maintain a $500,000 life insurance policy on himself with the plaintiff listed as the beneficiary. In its memorandum of decision, the court stated: "At the time of dissolution the defendant . . . [represented that he] received net income of $1701 per week and paid total weekly expenses of $2123. [The defendant] also indicated that [he] had total assets of $493,591 and owed total liabilities of $100,537." The defendant's net income was $88,452 and total expenses were $110,396. Despite that disparity, the defendant agreed to the $700 per week, or $36,400 annually.

In 2001, the defendant allowed the life insurance and health insurance policies to lapse and stopped paying alimony to the plaintiff. The plaintiff filed a motion for contempt, and the defendant filed a motion for a modification. The court found that the defendant was in contempt and that a change in circumstances existed. The court modified the dissolution judgment, ordering the defendant (1) to pay alimony of $500 per week, (2) to pay an alimony arrearage of $19,700, (3) to obtain a life insurance policy naming the plaintiff as the beneficiary and (4) to maintain health insurance for the plaintiff. These appeals followed.

I

The defendant first claims that the court improperly determined his earning capacity.[1] The defendant makes

[1] We note that it is not clear whether the court was considering the defendant's *earning capacity* or his actual *undisclosed earnings*. The difference is irrelevant for this analysis because in either situation, the court would have to impute income to the defendant on the basis of the evidence presented.

two separate arguments; first, he argues that the court improperly used his level of spending as a factor in determining his earning capacity, and second, he argues that the court's determination of his earning capacity was based on speculation and conjecture. We disagree.

The following additional facts, found by the court, are necessary for the resolution of the defendant's claim. At the time of dissolution, the defendant had total assets of $493,591. At the modification and contempt hearing, the defendant had total assets of $999,007. Part of the assets consisted of a beach club that the defendant owned with his extended family and 96 percent ownership in a New York City health club.

At the modification and contempt hearing, the defendant testified that he was experiencing financial difficulty. He testified that his expenses were $2852 per week and that he was operating at a net loss of $525 per week. He claimed that he did not draw a salary from either business.

The court did not find the defendant's testimony credible. Regarding the value of the specific assets, the court held that the "defendant's beach club and health club holdings were undervalued" because he had used a valuation of those assets from five years previously. Further, although the health club was not as profitable as it had been, it continued to pay "$315 per week toward the defendant's personal expenses. This amounts to a total of $16,380 in annual payments, which are made on the defendant's behalf. One of the expenses is for a Mercedes Benz automobile, which the [health club] leases for the defendant at the rate of $786 per month." Additionally, the defendant received a distribution of approximately $20,000 per year from the beach club. The defendant also had approximately $500,000

that was left from the sale of real estate assets that originally produced a $2 million profit.[2]

The court also found that the defendant had significant expenses that he was able to pay. The defendant was current on his $3612 per month mortgage payment for his six bedroom home. In addition, the defendant was current on all of his real estate tax obligations associated with the house. He also employed a maid, at approximately $80 per week, and a gardener, at approximately $8000 per season. The court found that the defendant paid $1837 per week in expenses. The court held that the defendant was personally paying approximately $60,000 per year in expenses with an additional amount being paid by the health club.

The court held that the "defendant earns, or has the present capacity to earn, approximate total gross income of at least $100,000 per year. The court [based] this finding on the following: (1) the level of the defendant's annual spending, which exceeds $100,000 per year; (2) the evidence that the defendant historically receives $20,000 each year from the beach club profits; (3) the amount of money remaining in the defendant's investment accounts, which the court finds could generate interest and dividend income of at least $18,000 per year if invested prudently; (4) the evidence that the defendant's health club business has continued to pay $315 per week, or $16,380 per year, toward his personal expenses; and (5) the evidence concerning the defendant's college degree [in finance] and extensive business and investment expertise, which leads this court to conclude that he could earn a gross salary of at least $60,000 per annum." Those calculations led the court to conclude that the defendant was currently earning, or had the present capacity to earn, a net income of $70,000.

---

[2] The defendant reaped a profit of $2 million despite the fact that the assets had been in foreclosure.

The standard of review is well established. On appeal, we will not disturb the factual findings of the court unless the findings are not based on evidence in the record and are clearly erroneous. See *Werblood* v. *Birnbach*, 41 Conn. App. 728, 730–31, 678 A.2d 1 (1996).

A

The defendant's first argument, which is that the court improperly used his spending as a factor in determining his income, fails. "Lifestyle and personal expenses may serve as the basis for imputing income where conventional methods for determining income are inadequate." *McCormick* v. *McCormick*, 159 Vt. 472, 477, 621 A.2d 238 (1993); see also *Collette* v. *Collette*, 177 Conn. 465, 469, 418 A.2d 891 (1979) (husband's actual income must be higher than $173 when he was able to make support payments of $225); *Palazzo* v. *Palazzo*, 9 Conn. App. 486, 487, 519 A.2d 1230 (1987) (husband's lifestyle, but not spending, used as factor in determining income). In *McCormick*, the Vermont Supreme Court upheld a trial court's decision to impute income to a father on the basis of the father's expenses. There, the trial court stated that " 'there is a significant discrepancy between the amount of income claimed by the [father] and his total expenses.' " *McCormick* v. *McCormick*, supra, 476. Further, the trial court found that the father's testimony regarding his income was not credible. Id. The Vermont Supreme Court held that "[b]ecause the father's evidence was not credible, we find no error in . . . the court's decision to apply income imputation based on expenses." Id., 477.

In this case, the court did not find the defendant to be credible with regard to his financial status, and specifically held that "the defendant undervalued his interest in the beach club and health club businesses . . . ." The court could not rely on conventional methods of determining income, e.g., pay stubs, because the

defendant claimed that he did not draw a salary from his businesses. Because the court did not find the defendant credible, the court did not abuse its discretion when it used his spending level as a factor in determining his income in the absence of other methods of determining income. See *McHenry* v. *McHenry*, 424 A.2d 1067, 1068 (R.I. 1981) (court examined defendant's lifestyle, expenses in determining income when court believed defendant untruthful).

B

The defendant next argues that the court improperly based its determination of his earning capacity on speculation and conjecture. "In a marital dissolution proceeding, the court may base financial awards on earning capacity rather than actual earned income of the parties. . . . While there is no fixed standard for the determination of an individual's earning capacity . . . it is well settled that earning capacity is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." (Citations omitted; internal quotation marks omitted.) *Bleuer* v. *Bleuer*, 59 Conn. App. 167, 170, 755 A.2d 946 (2000).

We conclude that the court properly determined the defendant's earned income on the basis of the evidence before it. As set forth, the court was justified in relying on the defendant's spending in determining his earning capacity. The court could rely on the historical production of the beach club to determine that it would continue to produce $20,000 per year. The court could reasonably base its finding of $18,000 in investment income on the evidence that the defendant still had

$500,000 and had significant financial acumen.[3] The court could consider the defendant's ability to salvage $2 million in profit from the sale of assets in foreclosure and his college degree in finance as indicators of his financial acumen. The evidence regarding the health club's payment of expenses was uncontested. Regarding the finding that the defendant could earn a gross salary of $60,000, the court reasonably could have based its conclusion on the fact that at one time, he had net earnings of approximately $88,000 per year. That conclusion was buttressed by the defendant's financial sophistication and interest in the health and beach clubs.

No single piece of evidence alone would support the court's holding; when the evidence is taken together, however, it provides the underpinning for the fair and reasonable conclusion that the defendant was either earning, or capable of earning, a significant amount of money. The court's finding that the defendant was earning or could earn $100,000 was not clearly erroneous.

II

The defendant's second claim is that the court improperly adjudicated him in contempt for failing to pay alimony to the plaintiff. The defendant argues that the court improperly determined that he could pay the contempt order because the court based its decision on the mistaken conclusion that he was earning or could earn $100,000. We disagree.

"[O]ur review [of a finding of civil contempt] is technically limited to questions of jurisdiction such as whether

---

[3] The defendant cites *Miller* v. *Miller*, 16 Conn. App. 412, 417, 547 A.2d 922, cert. denied, 209 Conn. 823, 552 A.2d 430 (1988), and argues that stocks are too speculative to predict a rate of return. *Miller* is factually distinguishable; the *Miller* court was addressing the issue of the fluctuations of income from dividends. That is not the issue here.

the court had authority to impose the punishment inflicted and whether the act or acts for which the penalty was imposed could constitute a contempt. . . . This limitation originates because by its very nature the court's contempt power . . . must be balanced against the contemnor's fundamental rights and, for this reason, there exists the present mechanism for the eventual review of errors which allegedly infringe on these rights. . . . We have found a civil contempt to be improper or erroneous because: the injunction on which it was based was vague and indefinite . . . the findings on which it was based were ambiguous and irreconcilable . . . the contemnor's constitutional rights were not properly safeguarded . . . the penalties imposed were criminal rather than civil in nature . . . and the contemnor, through no fault of his own, was unable to obey the court's order." (Internal quotation marks omitted.) *Eldridge* v. *Eldridge*, 244 Conn. 523, 527–28, 710 A.2d 757 (1998).

Because we have concluded that the court's finding that the defendant was earning or could earn $100,000 was not clearly erroneous, we conclude that the court's decision that he could pay the alimony arrearage was not improper. The defendant makes no other arguments in support of his claim.

### III

On the cross appeal, the plaintiff's first claim is that the court improperly determined that her earning capacity had changed. The plaintiff argues that the court lacked the evidence to determine her earning capacity. We disagree.

The following additional facts, found by the court, are necessary for the resolution of the plaintiff's claim. At the time of the dissolution, the plaintiff represented that she had no employment earnings. Her only income was $675 weekly, which she received as pendente lite

alimony. Her weekly expenses were $1026. The court stated in its memorandum of decision: "Her total assets were $436,485, and her total liabilities were $90,199."

At the hearing, the plaintiff testified that after the dissolution, she began auditing business courses at Rice University. In addition, the plaintiff worked as a receptionist for six months and managed to earn $14,000 in that year. The plaintiff explained that she currently works as a personnel recruiter for her sister's company. The plaintiff denied that she earned a salary and claimed to have made very little money in commissions. The plaintiff admitted that she had not listed some of her accounts on her financial affidavit. The financial affidavit did reveal, however, that the plaintiff earned $346 per week in interest from her investment accounts.

The court did not find the plaintiff's testimony in that regard to be credible. Rather than rely on the plaintiff's testimony, the court determined her earning capacity. The court found that the "plaintiff has the present capacity to generate a total gross income of approximately $38,000 per annum. . . . The plaintiff appears to be healthy and capable, and has held several jobs in the past. Based on the evidence presented . . . the court finds that she has the present capacity to earn gross income of $20,000 per year, or $384.61 per week. In addition, the plaintiff earns approximately $18,000 per year in interest income. Adjusting the combined gross income figure of $38,000 for state and federal tax, medicare and social security deductions, the court finds that the plaintiff has the present capacity to generate net annual income of $28,500, or $548 per week."

As set forth in part I, we subject the court's factual conclusions to a deferential review; we will overturn a court's factual conclusions only if they are not based on evidence in the record and are clearly erroneous. See *Werblood* v. *Birnbach*, supra, 41 Conn. App. 730–31.

"Earning capacity . . . is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." *Lucy* v. *Lucy*, 183 Conn. 230, 234, 439 A.2d 302 (1981).

The court properly determined the plaintiff's income. The court had before it evidence that the plaintiff had earned approximately $14,000 per year. The court reasonably could have concluded that the plaintiff was more employable because of her increased education. The court's conclusion that the plaintiff earned $18,000 per year in interest also is supported by the evidence. The plaintiff's financial affidavit revealed that she was receiving $346 per week in interest.

The plaintiff argues that this case is similar to *Schmidt* v. *Schmidt*, 180 Conn. 184, 190–91, 429 A.2d 470 (1980), in which our Supreme Court held that the trial court's determination of earning capacity was improper because there was no evidence on which to base the amount of income. *Schmidt* is distinguishable from the present case because in this case, the court had specific evidence of the plaintiff's earnings. Although the evidence of earnings was dated, it still provided a basis for the court to determine the plaintiff's earning capacity. See *McKay* v. *McKay*, 174 Conn. 1, 2, 381 A.2d 527 (1977). The court's determination that the plaintiff could earn a gross income of $38,000 per year was not clearly erroneous.

## IV

The plaintiff's second claim is that the court improperly determined that changed circumstances existed. The plaintiff argues that the court's determination of changed circumstances regarding alimony, and its determination that circumstances had not changed regarding health and life insurance are logically incon-

sistent. The plaintiff urges us to conclude that the court improperly made the initial finding of changed circumstances. We disagree.

On appeal, we review the court's decision to determine whether the court abused its discretion. See *Bleuer* v. *Bleuer*, supra, 59 Conn. App. 169; see also *LaBow* v. *LaBow*, 13 Conn. App. 330, 345, 537 A.2d 157, cert. denied, 207 Conn. 806, 540 A.2d 374 (1988). "[E]very reasonable presumption will be given in favor of the trial court's ruling, and [n]othing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference." (Internal quotation marks omitted.) *Bleuer* v. *Bleuer*, supra, 169.

The plaintiff misinterprets the court's decision and the dissolution judgment. The court held that "the agreement, which was incorporated into the dissolution judgment, clearly stated that the defendant's payments of medical insurance premiums 'shall be considered as additional alimony.' The court finds that the order requiring the defendant to maintain medical insurance for the plaintiff was in the nature of alimony . . . ." Similarly, the "defendant's obligation to maintain life insurance coverage would continue during the term of his obligation to pay alimony. . . . [T]he court finds that the life insurance order was intended to secure an alimony obligation."

In *Borkowski* v. *Borkowski*, 228 Conn. 729, 736–37, 638 A.2d 1060 (1994), our Supreme Court held that a trial court considering the modification of a dissolution decree may consider the same factors used to determine the initial award of alimony. General Statutes § 46b-82 gives the court discretion when determining the initial alimony award. As the insurance obligations were considered alimony substitutes, the court reasonably could decide to modify one aspect of the defendant's alimony

obligations, i.e., the money payments, without modifying other aspects, such as providing insurance. The court did not abuse its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.